**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Civil Action No.** |
| **v.** | ) ) | **3:16-cv-00769-HTW-LRA** |
| **DANNY'S RESTAURANT, LLC AND DANNY'S OF JACKSON, LLC F/K/A BABY O'S RESTAURANT, INC D/B/A DANNY'S DOWNTOWN CABARET** | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

**PLAINTIFF EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S
MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AS TO LIABILITY**

## I.   INTRODUCTION

Plaintiff, United States Equal Employment Opportunity Commission ("EEOC"), submits this memorandum in support of its Motion for Summary Judgment Regarding Liability against Defendant Danny's of Jackson, LLC.

## II.   PLAINTIFF'S STATEMENT OF FACTS

### A.  Operations of Club

1. Structure of Club

Danny's Downtown Cabaret ("Danny's Downtown") is a strip club operating in downtown Jackson, Mississippi. (Ex. A, Def. Resp. to EEOC Interrog. No. 11). The club employs female entertainers who dance nude for patrons. (Ex. B, Declaration of Adria Samuel ¶

2, February 5, 2018 ("Samuel Decl.")). The club has one main stage and three to four satellite stages where the entertainers dance nude to music in exchange for tips from patrons. (Ex. C, Michael Rayner Dep. 45:17-20, October 25, 2017 ("Rayner Dep.")). The facility has private VIP areas around the perimeter of the club that allow patrons to receive more intimate and private dances from the nude entertainers in exchange for a set minimum fee. (Rayner Dep. 79:16-81:1). The club operates cameras in the private areas of the club to ensure dancer safety. (Ex. D, Brittany Rayner Dep. 25:14-26:2, September 20, 2017 ("Brittany Dep."; Ex. E, Declaration of Sharday Moss ¶37 January 31, 2018 ("Moss Decl.")).

The majority of the club consists of a large, open floor area that contains tables and seating for patrons to watch the dancers on stage and to drink alcohol. Dancers, in between dancing on stage, may circulate around the open floor, interacting with patrons and soliciting private dances and drinks. Waitresses move from table to table taking and fulfilling drink orders. (Brittany Dep. 21:8-11). Security and management frequently walk the floor to keep track of the number of dances each nude entertainer is selling and to provide an extra layer of security for the dancers. (Moss Decl. ¶37; Brittany Dep. 30:15-22; 44:13-21). The club features a small bar with a seating area, serving beer (but no liquor), four or five televisions scattered throughout the facility. (Rayner Dep. 45:8-16).

2.   Club Operations

The club operates on two shifts—a day shift and a night shift. (Rayner Dep. 40:6-12; Brittany Dep. 47:23-48:7). The night shift began at 7:00 p.m. and all dancers working the night shift were required to report by 11:00 p.m. (Rayner Dep. 79:2-10). A dancer's income for a shift consists of tips earned from customers for dancing on stage and performing private dances minus mandatory payments to the club and minus any payments on outstanding fines owed to the club.

(Samuel Decl. ¶6;  Ex. F, Allison Wade Dep. 97:24-2, October 13, 2017 ("Wade Dep."); Rayner Dep. 46:8-10; The amount of money a dancer will earn on a particular shift depends, in large part, on the number of customers who patronize the club on that particular shift. Night shifts make the most money. (Brittany Dep. 49:5-6). Thursday, Friday and Saturday nights are the most lucrative for the dancers. (Brittany Dep. 49:7-9).   A dancer who reports to work a shift is required to work at least six hours. (Rayner Dep. 78:5-79:1). If a dancer wants to leave before the required six hours, the club requires her to pay a fine of $5.00 for every half hour early she wants to leave. (Rayner Dep. 78:5-79:1).

    3.   <u>Club Management</u>

Managers are responsible for "checking in" the dancers, ensuring that bar staff and employees showed up to work, ensuring the dancers were making an effort to sell dances to patrons, running specials, checking and writing a report on the register hourly, imposing and collecting fines, counting out money and generally enforcing the rules of the club. (Rayner Dep. 42:16-45:7; 46:2-7; 51:16-53:2; 55:1-17). At the end of the shift, the manager collects the club's cut of all the private dances sold by each nude dancer. (Rayner Dep. 46:8-10).[1]

The night manager then prepares a daily report laying out sales at the bar, at the front door, and a dance sheet listing each dancer and the number of dances she had sold. (Rayner Dep. 47:25-49:20). The daily reports were sent to Linda Hilty (bookkeeper for Baby O's in Memphis), Danny McGee Owens and Dax Owens. (Rayner Dep. 48:1-50:19).

During the relevant time period, all managers reported to Dax Owens, who was considered the general manager of the club. (Brittany Dep. 29:4-9). Dax acted as general manager of the club from at least 2010 through 2016. (Rayner Dep. 67:15-19; Ex. G, Danny of

---

[1] The day shift manager often acted as both bartender and manager. (Brittany Dep. 22:13-17). During the night shift, there were usually two managers. (Wade Dep. 68:18-21).

Jackson 30(b)(6) 88:6-22, January 17, 2018 ("Owens 30(b)(6).")). There was an office in the front of the club for the regular managers. (Rayner Dep. 94:22-95:1). There was another separate office for Dax. (Rayner Dep. 94:22-95:1). Dax had to approve all hiring for the club. (Rayner Dep. 62:25-63:19). "Pretty much everybody answered to Dax." (Rayner Dep. 95:20). Despite its location in the middle of Jackson, Mississippi, Danny's Downtown was (and remains) an essentially an all-white club. Rayner never saw any black managers, waitresses, front door staff or bartenders. (Brittany Dep. 45:22-46:14). The vast majority of the dancers were white. (Brittany Dep. 47:20-22; Wade Dep. 71:1-3).

## B. Danny's Downtown is a Serial Violator of Title VII

### 1. 2011 Edwards Charge

In or around April of 2011, Sherida Edwards ("Edwards") filed a charge of discrimination with the EEOC against Danny's. (Ex. H, Edwards Charge of Discrimination).[2] Edwards was hired as a dancer by Danny's in 2009. She asserted in her charge that she, and other black female dancers had been discriminated against by being subjected to disparate terms and conditions of employment. Specifically, Edwards asserted that black females were forced to adhere to a dance schedule imposed on them by management. (*Id*.). The dance schedule required them to work certain days and shifts. Black dancers who missed an assigned shift were charged a fine of $25.00. White female dancers were not forced to adhere to any dance schedules provided by management. Instead white female dancers could set their own schedule. (*Id*.).

### 2. EEOC Investigation and Letter of Determination

The EEOC investigated and found cause to believe that Danny's Downtown had discriminated against Edwards and a class of black female dancers. (Ex. I EEOC Letter of Determination dated April 24, 2012.). The EEOC determined that Danny's "limited the number

---

[2] Edwards submitted an amended charge to the EEOC in or around October 2011.

of black dancers who could perform on a single shift, and required black dancers to work an assigned schedule." (*Id.*). A black dancer's failure to adhere to the assigned schedule led to "financial sanctions." (*Id.*). The EEOC determined that Danny's Downtown did not require white dancers to adhere to any schedule. The EEOC determined that subsequent to the filing of the Edwards charge, Danny's Downtown engaged in "increasingly severe disparate terms and conditions of employment," against a class of black females on the basis of race, and retaliation against Edwards which resulted in her constructive discharge. (*Id.*). Finally, the EEOC determined that Danny's Downtown had constructively discharged Edwards on the basis of race and in retaliation for her filing a charge of discrimination, subjecting her to a "relentless pattern of harassment and threats" and "limiting her work schedule." (*Id.*).

    3.  <u>EEOC files Suit and Settles by a Consent Decree</u>

The EEOC filed suit against Baby O's Restaurant d/b/a Danny's on September 28, 2012. *Equal Employment Opportunity Commission v. Baby O's Restaurant, d/b/a Danny's*, No. 3:12-cv-00681-DPJ-FKB (S.D. Miss. Sept. 28, 2012). The EEOC complaint catalogued Danny's Downtown's discriminatory conduct, which included, among other things: forcing black dancers to adhere to mandatory scheduling, requiring black dancers to work on less lucrative shifts, harassing and pressuring Edwards to withdraw her charge of discrimination with the EEOC, subjecting black dancers to fines not imposed on white dancers, and maintaining a schedule only for black dancers. (Doc. 1, pp 3-6). The EEOC suit was settled nine months later, on June 28, 2013 by Consent Decree. (Doc. 9).[3]

The case led to few, if any, changes in the operations of the club. Rayner testified that as a manager he did not receive any antidiscrimination training while working at Danny's

---

[3] The EEOC in 2016 filed a motion for civil contempt sanctions against Baby O's Restaurant Inc. for violations of the 2013 consent decree. (Doc. 28). The action resulted in the entry of a second amended consent decree. (Doc 42).

Downtown. (Rayner Dep. 66:2-9). Brittany Rayner, who, from approximately 2012 to 2015, worked at Danny's Downtown as a dancer, bartender, door girl, and occasional manager received no antidiscrimination training during her tenure at Danny's Downtown. (Brittany Dep. 66:5-11). Alison Wade, who worked in various non-dancer roles from 2012 through 2016 never received any antidiscrimination training. (Wade Dep. 82:16-83:14).  Wade did recall one training session with Dax:  the training consisted of Dax bringing a lawyer into the club who informed the staff that Dax could "fire you for whatever reason he chooses to fire you." (Wade Dep. 83:4-10).

**C.  2013 EEOC Charge**

On August 2, 2013, Ashley Williams ("Williams" or "Charging Party") filed a charge with the EEOC's Jackson Area Office alleging that she had been discriminating against on the basis of her race (black) while working at Danny's Downtown Cabaret. (Ex. J, Williams Charge) Specifically, Williams alleged that she was fired from her position as a dancer because she had refused to work at Black Diamonds, a club that had recently opened across the street, where she felt less comfortable and was not licensed to work. *Id.* When she refused to work across the street, Williams was told that she needed to pay $100.00 to work at Danny's or leave. *Id.*

A notice of the charge was sent to Danny's Downtown Cabaret. Dax Owens, Manager of Danny's Downtown Cabaret, received notice of the charge. (Ex. K, Affidavit of Dax Owens ¶ 3, January 18, 2018 ("Dax Decl.")). Dax Owens informed his father Danny McGee Owens of the charge (Dax Decl. ¶ 4) and retained legal counsel, Mike Farrell, to assist with defense of the charge. (Ex. L. Declaration of Mike Farrell, ¶¶ 4-7, January 24, 2018 ("Farrell Decl.")). Williams' charge was investigated and a Letter of Determination was issued on June 1, 2016 finding reasonable cause to believe that Defendant subjected Charging Party and a class of black female employees to disparate terms and conditions of employment on their basis of race in

violation of Title VII. (Ex. M, EEOC Letter of Determination). Defendant was invited to conciliate the claims of Williams and the class of black female employees. *Id*. Conciliation failed and a notice of the failure of conciliation was issued on July 29, 2016. The EEOC then filed its complaint alleging that Defendant subjected black female dancers to disparate terms and conditions of employment due to their race (Black) on September 30, 2016. (Doc. 1).

### D. Discriminatory Practices at Danny's Downtown Cabaret

#### 1. Only Black Dancers Were Subjected to a Dancer Schedule

Black dancers at Danny's Downtown Cabaret were subjected to a work schedule that limited the number of black dancers on any given shift. (Rayner Dep. 145:17-146:1, 170:23-171:13; Ex. N, Declaration of Latoria Garner ¶ 16, January 31, 2018 ("Garner Decl.")). Black dancers were required to schedule their work shifts each week – at least one day a week and one weekend shift – in advance. *Id.* The schedule was completed by the managers in advance and black dancers were only allowed to work during their scheduled shifts. (Garner Decl. ¶ 16; Ex. I Edwards Charge). If a black dancer did not show up for her scheduled shift, she was fined. (Rayner Dep. 145:27-146:1; 172:8-21). White dancers were not required to schedule their work shifts in advance and were free to simply show up for shifts. This black dancer schedule led to the charge of discrimination filed by Edwards in 2011. (Ex. I, Edwards Charge).

#### 2. Only Black Dancers were Subjected to a Quota

After Edwards' EEOC Charge in 2010, Danny's Downtown Cabaret eliminated the black dancer schedule. (Garner Decl. ¶ 17; Rayner Dep. 172:8-21). In its place, a black dancer quota was implemented. (Rayner Dep. 115:23:4, 118:1-6; Wade Dep. 77: 12-18). The black dancer quota limited the number of black dancers that could work on any given shift and varied

depending on the ratio of black to white dancers. (Brittany Dep. 69:23 – 70:21; 86:12-20, 88:12-16).

Michael Rayner ("Rayner") worked at Danny's from 2010 to 2014. (Rayner Dep. 18:11-25). He worked as a manager during his entire employment at Danny's. (Rayner Dep. 40: 6-17). Dax was Rayner's General Manager during his entire employment at Danny's. (Rayner Dep. 41:20-25). Rayner worked primarily on the night shift. (Rayner Dep. 42:13-15). As a manager, Rayner was responsible for checking in dancers as they arrived. In addition to writing down dancer's name and check in time, Dax informed Rayner that he also needed to also include the race of the dancer. (Rayner Dep. 113:9-114:3). Dax would limit the number of black dancers who could work on a shift and inform Rayner that there were "too many black girls." (Rayner Dep. 115:23:4, 118:1-6). Rayner felt uncomfortable sending black dancers home and he would try to avoid sending black dancers home. (Rayner Dep. 116:5-13). Rayner typically arrived at the club around 7:00 p.m. and knew that Dax would not arrive until later. He would try to let the black dancers work until Dax arrived later in the evening. (Rayner Dep. 117:21-118:9). Rayner would get in trouble with Dax when he refused to send black dancers home. (Rayner Dep. 116:14-20. Dax would verbally reprimand Rayner, put Rayner on worse shifts and generally "make it hard on [Rayner] down the line." (Rayner Dep. 14-21). This black quota was in effect the entire time that Rayner worked at Danny's. (Rayner Dep. 116:22-25).

In addition to limiting the number of black dancers, Dax demanded Rayner charge black customers more than white customers. (Rayner Dep. 125:4-6, 126:7-10, 154:4-8). Each cash register included buttons for black, white and other. (Rayner Dep. 121:7-12). Rayner was uncomfortable charging black customers more than white customers and would instruct door staff to not do it "if they could get away with it without getting in trouble." (Rayner Dep. 125:18-

22, 126:18-21). Dax's animus towards black people led to Rayner quitting Danny's. In 2014, Rayner was dating his now wife Brittany Rayner. Brittany Rayner is white but has biracial children from a prior relationship. Rayner discovered that Dax had referred to Brittany as a "N-lover" because of her prior relationship with a black man. (Rayner Dep. 129:5-130:3). He quit shortly afterward. *Id*.

Alison Wade ("Wade") worked at Danny's from July of 2012 to December of 2016. (Wade Dep. 12:11-13). During her time at Danny's, Wade worked as a waitress, door girl and eventually the night shift manager. (Wade Dep. 14:23-15:3). As a door girl, Wade was responsible for processing paperwork and keeping track of everything from dancer arrival to the race of Danny's customers. (Wade Dep. 17:21-18:7). As the door girl, Wade checked in customers. The cash register at both the front door and the bar included buttons that indicated whether a customer was "black, white or other." (Wade Dep. 18:10-20:3; Ex. O, Cash Register Photo). The cash registers contained buttons for "black, white or other" during Wade's entire employment at Danny's. (Wade Dep. 22:3-5).  While Wade was a door girl, Danny would call her from prison to inquire about the club's numbers and want to know how many black people were in the club, how many dancers were working, etc. (Wade Dep. 34: 2-8, 93:13-20, 93:23-94:2, 98:11-15). He would call almost every night. (Wade Dep. 34:9-14, 60:6-9).  Wade would get a call from either Dax, who did not arrive to the club until later, or Danny and they would ask "how many black people are there." (Wade Dep. 77:4-12). Wade would inform them of the current dancer count and she would be told "if any more black girls come in, tell them they can't dance tonight." (Wade Dep. 77: 12-18). If a black dancer reported for work after Danny or Dax had informed Wade that the club had reached its limit of black dancers, she would have to inform the black dancer that she was not able to dance. (Wade Dep. 78:17-22). The limit on

black dancers would vary based on the number of white dancers working. (Wade Dep. 77:21-78:5, 92:4-9). Wade was never told to limit the number of white dancers. (Wade Dep. 78:6-8). The limit was only on black dancers. (Wade Dep. 78:9-12). This limit on the number of black dancers continued until around the time that the club Black Diamonds was opened. (Wade Dep. 94:22-23).

Wade became a night manager in approximately 2015. (Wade Dep. 16:7-11). As a manager, Wade was responsible for completing the nightly dance sheet. Managers were responsible for recording what time a dancer checked in. (Wade Dep. 38: 2-8). In addition, the sign in sheet included a column for the managers to list the race of the dancers – white, black or other. (Wade Dep. 38: 17- 39:6). Danny wanted to know the race of the dancers. (Wade Dep. 39:2 – 11).  When Danny Owens began managing Danny's after his release in 2016, he made it clear to Wade that he did not want any black dancers at Danny's. (Wade Dep. 71: 4-10). Danny told Wade he did not want "any N Words in his club" and would fire black dancers. (Wade Dep. 71:7-22). Danny Owens openly and frequently used the "N Word" in the club. (Wade Dep. 76: 4 – 10). Black dancers were allowed to continue to work at Danny's only if they were making a lot of money for the club. (Wade Dep. 71:11-16, 72:3-15). Two pairs of black dancers were not allowed to dance back to back on stage. (Wade Dep. 128:12-19). Wade was also not allowed to hire any additional black dancers. (Wade Dep. 72: 19 – 73:6). Wade was allowed to hire white dancers "any time [she] wanted," but she was required to submit the photos of any potential black dancers. (Wade Dep. 72:22 – 73:6). When Wade did submit a photo of a potential black dancer, Danny would tell Wade "we've got enough black girls here, we don't need any more, no, don't hire them." (Wade Dep. 73:3-6).

Brittany Rayner ("Brittany") worked at Danny's from 2012 to 2014. (Brittany Dep. 18: 11-13). Brittany was initially hired as a waitress but during her tenure at Danny's she worked as a waitress, bartender, door girl, dancer and occasional day shift manager. (Brittany Dep. 20:17-21:1). Dax was the general manager during Brittany's entire employment at Danny's. (Brittany Dep. 29:4-9). During her employment, Danny's never had a black manager, black waitress, or black DJ. (Brittany Dep. 46: 5-22). As a manager, Brittany was instructed on how to check in dancers at the beginning of the day shift by Dax. She was instructed by Dax to write down the time that a dancer signed in and their race: black, white or other. (Brittany Dep. 51:13-17; 68:21-69:4). Brittany heard Dax instruct the night manager that there were "too many black girls so you need to send so and so home." (Brittany Dep. 69:13-16). The number of black girls that were "too many" varied based on the ratio of currently working white dancers to black dancers. On a slow night if Danny's had "three white girls and five black girls," Dax would inform the manager to send some of the black dancers home. (Brittany Dep. 69:23 – 70:21; 86:12-20, 88:12-16). Black dancers that were sent home were not able to work at all. Brittany never heard Dax send any white dancers home. (Brittany Dep. 70: 22- 24). Brittany was also aware that Dax instructed Mike Rayner to charge black patrons more than white patrons. (Brittany Dep. 71: 7-19). After Black Diamonds opened in 2013, managers were instructed to refer any potential black dancers to Black Diamonds. (Brittany Dep. 73: 11-15). Specifically, Brittany was instructed by Dax that potential black dancers were not to be given an application to dance at Danny's. (Brittany Dep. 77:10-20, 78:1-6). Instead, she and other managers were instructed to refer any potential black dancers to the manager at Black Diamonds. (*Id).*

3.  <u>Discriminatory Treatment of Black Customers at Danny's Downtown Cabaret</u>

Danny's animus was not limited to black dancers but also extended to black customers. Both the registers at the bar and the front door included buttons labeled "White", "Black" and "Other." (Ex. O, Photo of Register) Managers were instructed that it was for "demographic" purposes, but in reality, it was used to overcharge black patrons. (Rayner Dep. 115:16-19; 128:9-19). Manager Mike Rayner was instructed to charge black customers double of what white customers were charged for entry while he worked at Danny's. (Rayner Dep. 125: 4-6, 126:7-12). After his release in 2016, Danny excluded any and all black patrons from Danny's. (Wade Dep. 71:23: 72:2). No black customers at all were allowed in the club. (Wade Dep. 73: 23 – 74:3). This prohibition on black customers continued for so long, and created enough anger from black dancers and black customers, that Wade asked Blake Owens, Danny Owen's son, to intervene and convince his father to allow black customers to return to the club. (Wade Dep. 74:2-17). Even after Danny Owens allowed black customers to return, he had specific rules for black customers. (Wade Dep. 74: 15 – 75:7). If a black customer wanted to enter Danny's, they faced more scrutiny than white customers. *Id.* Black customers were required to dress a certain way, be a certain type and "speak more properly." (Wade Dep. 75:3 – 19). White customers were not subjected to the same rules. (Wade Dep. 75: 14 – 17).

### 4. Only Black Dancers Were Forced to Work at Black Diamonds

In 2013, Dax opened another adult entertainment club in Jackson, MS called Black Diamonds. Black Diamonds was located across the street from Danny's. (Rayner Dep. 135:13-15). Black Diamonds was supposed to be a strip club that appeals to black customers. (Garner Decl. ¶ 28; Ex. P, Declaration of Ashley Williams ¶ 25 ("Williams Decl"); Ex. Q, Declaration of Jordyn Riddle ¶ 30 ("Riddle Decl."); Samuel Decl. ¶ 30). Dax was the General Manager for both Black Diamonds and Danny's and would travel back and forth between the two clubs. (Rayner

Dep. 135:23-136:1; Brittany 86:24-87:2). Before Black Diamonds' grand opening, Dax told all the black dancers at Danny's that they were going to work the Black Diamonds grand opening. (Williams Decl. ¶ 26; Garner Decl. ¶ 29; Riddle Decl. ¶ 31; Moss Decl. ¶ 27; Samuel Decl. ¶ 33). Dax told the black dancers that if they refused to work at Black Diamonds they would be fined (Williams Decl. ¶ 26; Riddle Decl. ¶ 33; Samuel Decl. ¶ 33; Garner Decl. ¶ 29) or sent home without working (Moss Decl. ¶ 28).

The working conditions at Black Diamonds were significantly different from Danny's. There was no working air conditioning at Black Diamonds, and, because the grand opening was in the summer, it was very hot and uncomfortable for the dancers. (Samuel Decl. ¶ 38; Moss Decl. ¶ 33; Riddle Decl. ¶ 38). Danny's had functioning air conditioning that kept the club at a reasonable temperature. (Garner Decl. ¶ 33; Williams Decl. ¶ 30). During the grand opening, there were also leaks in the ceiling that pooled on the stage and were a hazard to anyone walking around in high heels. (Williams Decl. ¶ 31; Moss Decl. ¶ 34; Garner Decl. ¶ 34). Black Diamonds had less security personnel than Danny's and, accordingly, less assistance to ensure a dancer's safety. (Moss Decl. ¶ 37; Williams Decl. ¶ 34; Riddle Decl. ¶ 42). Because of the increased security personnel at Danny's, dancers were watched more closely and could easily attract security's attention if an issue arose with a customer, which occurred often. (Wade Dep. 133: 17-134:4; Williams Decl. ¶ 34, Samuel Decl. ¶ 41; Garner Decl. ¶ 36). In addition, unlike Black Diamonds, there were cameras in the lap dance and private dance areas at Danny's to keep dancers safe. (Garner Decl. ¶ 36; Samuel Decl. ¶ 41).  Dancers at Black Diamonds had less potential earnings. At Danny's, dancers earned money on both the stage and private dances. (Brittany Dep. 92:12-20). At Black Diamonds, there were no private dances and dancers were wholly dependent on stage money. (Wade Dep. 119:6-14).

The black dancer quota at Danny's stopped around the time that Black Diamonds opened. (Wade Dep. 94:22-95:4). Instead, black dancers from Danny's were forced to work across the street at Black Diamonds if there were "too many" black dancers at Danny's. (Williams Decl. ¶ 38; Garner Decl. ¶ 39; Samuel Decl. ¶ 45). Similarly, after Black Diamonds opened, Brittany Rayner was told that if any black dancers came to Danny's to apply, to send them to Black Diamonds to apply instead. (Brittany Dep. 73:11-15). Black potential dancers were not allowed to talk to the manager at Danny's. (Brittany Dep. 77:10-21).

Black Dancers who refused to work were subjected to fines, being sent home and having to pay to work at Danny's. Dax would fine black dancers who refused to work at Black Diamonds. (Samuel Decl. ¶ 34; Moss Decl. ¶¶ 29,41; Williams Decl. ¶¶ 26, 40; Riddle Decl. ¶¶ 34, 45, 46; Garner Decl. ¶ 29). The amounts of the fine would vary. (Riddle Decl. ¶ 33; Samuel Decl. ¶ 34; Moss Decl. ¶ 29). Dax would send black dancers who refused to work at Black Diamonds home. (Riddle Decl. ¶ 34; Garner Decl. ¶ 41). Dax would require black dancers to pay him money to work at Danny's or work across the street at Black Diamonds. (Samuel Decl. ¶ 6; Williams Decl. ¶ 39; Garner Decl. ¶ 42).  Rayner was aware that some girls were charged money to come over from Black Diamonds to Danny's. (Rayner Dep. 142:24-143:10). White dancers were not required to work at Black Diamonds and were not fined for refusing to work at Black Diamonds. (Samuel Decl. ¶ 47; Riddle Decl. ¶ 50; Moss Decl. ¶ 42; Williams Decl. ¶ 44; Garner Decl. ¶ 44).

### E.  Class Members

#### 1.  <u>Ashley Williams</u>

Ashley Williams ("Williams") was hired as a dancer at Danny's in September of 2012. (Williams Decl. ¶ 2). Williams was subjected to discrimination on the basis of her race during

her employment. Williams was subjected to a black dancer quota and was sent home multiple times a week because there were "too many black girls." (Williams Decl. ¶¶ 18, 19, 21). Williams witnessed black customers being charged more to enter Danny's than white customers. (Williams Decl. ¶ 23). Williams was forced to work Black Diamonds' grand opening and two other occasions. (Williams Decl. ¶¶ 28, 34). During the two times Williams worked at Black Diamonds after its grand opening, she earned significantly less than she would have earned at Danny's during the same shift. (Williams Decl. ¶ 34). Dax required Williams to pay to work at Danny's. (Williams Decl. ¶ 39). Williams was sent home multiple times for refusing to work at Black Diamonds. (Williams Decl. ¶ 40). Each time Williams was sent home, she was fined. (*Id.*) Each time Williams was sent home, she was unable to work and lost all her potential earnings for the lost shift at Danny's. (*Id.*) By the time of her termination, Williams' only fines were a direct result of her refusal to work at Black Diamonds. (Williams Decl. ¶ 41). Williams was fired on July 23, 2013 when Williams refused to pay Dax $100 upfront to dance at Danny's. (Williams Decl. ¶ 42). The fine was imposed on Williams for refusing to dance at Black Diamonds. (*Id.*)

2.  Latoria Garner

Latoria Garner ("Garner") was hired in 2006 as a dancer at Danny's. (Garner Decl. ¶ 2). Garner was subjected to discrimination on the basis of her race at Danny's. Dax was the General Manager of the club from the time she was hired until he stopped managing Danny's in 2016. (Garner Decl. ¶ 3). When Garner began working at Danny's in 2006, there was a specific schedule just for black dancers. (Garner Decl. ¶ 16). Dax would schedule and limit Garner, and other black dancers, to specific shifts three to four days a week. (Garner Decl. ¶ 16). After the black schedule ended, Garner's shifts were limited by the black quota system. (Garner Decl. ¶ 17). Garner was sent home a few times a week because of this limit on the number of black

dancers. (Garner Decl. ¶ 22). Dax used derogatory language and racial slurs openly, such as "Black Bitches," "Black Ass," and "Nigger Lover". (Garner Decl. ¶ 24). Garner was forced to dance at the Black Diamonds grand opening. (Garner Decl. ¶ 31). During the grand opening, Garner made substantially less money than she would have made at Danny's during the same shift. (Garner Decl. ¶ 37). After the grand opening, Garner refused to work at Black Diamonds again and was sent home a few nights a week for her refusal. (Garner Decl. ¶¶ 41, 43). Each time Garner returned to work at Danny's, Dax would try to force Garner to pay him money upfront before he would allow her to dance. (Garner Decl. ¶ 44).

3. <u>Sharday Moss</u>

Sharday Moss ("Moss") was hired as a dancer at Danny's in August of 2012. (Moss Decl. ¶ 2). Dax was the General Manager from the time of Moss's hire until his departure in 2016. (Moss Decl. ¶ 4). Moss has been subjected to discrimination on the basis of her race during her employment at Danny's. Moss witnessed other black dancers being sent home regularly due to the black dancer quota. (Moss Decl. ¶ 22). Dax referred to Moss and her sister, Riddle, as "half breeds." (Moss Decl. ¶ 23). Moss was forced to dance the Black Diamonds' grand opening. (Moss Decl. ¶ 31). After the grand opening, Moss refused to work at Black Diamonds again. (Moss Decl. ¶ 39) As a result, Dax fined Moss. (Moss Decl. ¶ 41).

4. <u>Jordyn Riddle</u>

Jordyn Riddle ("Riddle") was hired in February of 2013. (Riddle Decl. ¶ 2). Dax was the General Manager during Riddle's entire tenure at Danny's. (Riddle Decl. ¶ 5). Riddle was subjected to discrimination on the basis of her race while working at Danny's. Riddle was sent home because there were "too many" black girls working on a particular shift. (Riddle Decl. ¶ 24). Dax told Riddle that her hair was too "ethnic," and on at least one occasion sent Riddle

home because her hair was too curly. (Riddle Decl. ¶ 27.  Whenever Riddle was sent home, she lost all potential earnings for that shift. (*Id.*). Riddle was forced to work at Black Diamonds' grand opening. (Riddle Decl. ¶ 36). Riddle earned substantially less at Black Diamonds than she did at Danny's during the same shift. (Riddle Decl. ¶ 43). After the grand opening, Riddle refused to dance at Black Diamonds. (Riddle Decl. ¶ 45). Dax threatened to fine her every time she refused and not allow Riddle to work anywhere else. (Riddle Decl. ¶ 45). To avoid Dax's threatened fines, Riddle reluctantly danced at Black Diamonds an additional six or seven times. (Riddle Decl. ¶ 47). Each time Riddle worked at Black Diamonds, she made very little money. (*Id.*). To avoid being fined or forced to work at Black Diamonds, Riddle switched from the night shift to the day shift at Danny's. (Riddle Decl. ¶ 48). This switch had a significant financial impact on Riddle because the day shift had less customers and was therefore less lucrative for dancers. (Riddle Decl. ¶ 49).

　　5.　Adrea Samuel

Adrea Samuel ("Samuel") was hired as a dancer at Danny's in late 2011/early 2012. (Samuel Decl. ¶ 2). Samuel has been subjected to discrimination on the basis of her race while working at Danny's. Dax was the General Manager from the time of Samuel's hire until his departure in 2016. (Samuel Decl. ¶ 4). Danny's limited the number of black dancers who could work on any given shift and Samuel was a victim of this black dancer quota. (Samuel Decl. ¶ 23). Samuel was sent home multiple times a week as a result of this black dancer quota. (Samuel Decl. ¶ 26). As a result of being sent home, Samuel lost any potential earnings for that shift. (*Id.*) Samuel was forced to work Black Diamonds' grand opening. (Samuel Decl. ¶ 36). Samuel was forced to work at Black Diamonds two times after the grand opening, and earned substantially less money than should would have made at Danny's during the same shift. (Samuel Decl. ¶ 42).

## III.    LEGAL ARGUMENT

Summary judgment shall be rendered forthwith if the moving party shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). The federal court system favors the use of the summary judgment procedure to resolve cases in which there is no issue of material fact on the legal elements to be proven. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

In deciding whether to grant a motion for summary judgment, the trial court must consider whether there are any genuine fact issues remaining for trial. The mere existence of an alleged factual dispute between the parties is not sufficient to preclude summary judgment. The nonmovant must allege a dispute which might affect the outcome of the lawsuit under governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48. (1986). If the court determines that a material factual dispute exists, the nonmoving party must show that the dispute is "genuine" or that the evidence is such that the reasonable trier of fact could return a verdict for the nonmoving party. *Id*. at 248.

The Court should look to the elements which are essential to each party's proof of its case at trial. If one party meets its burden of proof and the other party wholly fails to do so, summary judgment is appropriate for the former. "[T]he burden on the moving party [once the moving party has met its burden of proof] may be discharged by 'showing' -- that is, pointing out to the

District Court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

### A. Racial Discrimination Under Title VII

Under Title VII, a plaintiff may prove a claim of employment discrimination through either direct or circumstantial evidence. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir.2003); *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). Direct evidence is evidence which, if believed, proves the fact without inference or presumption. *Jones v. Robinson Prop. Group L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). Where a plaintiff produces direct evidence of discrimination, he is entitled to bypass the *McDonnell Douglas* burden-shifting framework commonly applied in discrimination cases and proceed directly to the question of liability. *Stone v. Parish of East Baton Rouge*, 329 Fed. Appx. 542, 545 (5th Cir. 2009)(citations and quotations omitted).

### B. The EEOC Has Produced Direct Evidence of Racial Discrimination

In this case, the evidence of unlawful discrimination is direct, undisputed, and admitted. Defendant subjected Charging Party and Class Members to disparate treatment, including disparate working conditions and disparate working schedules, that caused both financial and emotional damage to them solely on the basis of their race.

Only black dancers were subjected to a race based quota that limited their earning opportunities. (Wade Dep. 78:6-12; Rayner Dep. 115:23-116:4). Defendant's former managers testified that Dax and Danny would limit the number of black dancers that were allowed to dance on any particular shift. (Brittany Dep. 69:23-70:3; Rayner Dep. 115:23-116:4). There was never a limit on the number of white dancers. (Wade Dep. 78:6-12; Brittany Dep. 70:22-24). The dancers at Danny's were predominantly white and its clientele was predominately white. (Rayner

Dep. 178: 11-16; 127:17-18). Despite the overwhelming majority of white dancers at Danny's, Defendant limited the number of black dancers on any given shift based on the ratio of white to black dancers. (Rayner Dep. 115:23-116:4; Wade Dep. 77:12-18). The ideal ratio of white dancers to black dancers varied. (Wade Dep. 77:19-78:5; Brittany Dep. 69:23 – 70:21). According to Wade, if Danny and/or Dax called later in the evening and there were "40 girls and 10 were black, that was all right." (Wade Dep. 77:24-25). If they called earlier in the day and "only 20 people checked in altogether and five were black, six were black, you weren't going to let any more black girls check in. That's too many black girls." (Wade Dep. 78:1-5). Any black dancers over the limit would be sent home. (Brittany Dep. 70:4-11; 86: 12-15; 88:12-17). Rayner testified that when Dax arrived in the evening, he would ask Rayner "what the ratio was, how many black girls." (Rayner Dep. 118:2-4). Depending on the number of dancers working, Dax would tell Rayner "[t]here's too many black girls. [Rayner] need[ed] to send somebody home or get more white girls here." (Rayner Dep. 118:3-6). Rayner testified that this limit on the number of black dancers working happened off and on during his entire four-year employment at Danny's. (Rayner Dep. 116:22-25). Rayner felt uncomfortable sending black dancers home, and would try to avoid enforcing Dax's orders. (Rayner Dep. 116:5-13). Dax would verbally reprimand Rayner, give him worse shifts and generally "make it hard on [him] down the line when [he] didn't follow instructions." (Rayner Dep. 116:14-21). Brittany testified that she overhead Dax telling Rayner there were "too many black girls so [he] need[ed] to send so and so home." (Brittany Dep. 69:13-16). Wade testified that when she was the door girl both Dax and Danny would call her inquiring about the number of white dancers and black dancers currently working. (Wade Dep. 77:4-20). Dax and Danny would tell Wade, "no more. If any more black girls come in, tell them they can't dance tonight." (Wade Dep. 77:13-18).

Only black dancers were prevented from applying to dance at Danny's. After Black Diamonds opened in 2013, Dax told Brittany Rayner that if a black woman came into Danny's, she was to "send them to Black Diamonds to apply." (Brittany Dep. 73:11-15; 77:10-20; 78:1-6). Black women were not to be given an application to dance at Danny's and were not allowed to talk to the manager at Danny's. (Brittany Dep. 77:10-21). As a manager, Wade was always allowed to hire white dancers anytime she wanted. (Wade Dep. 72:24-73:2). After Danny was released from prison in 2016, Wade was not allowed to hire any black dancers and, when she submitted photos of potential black dancers to Danny, he would tell her no or "we've got enough black girls here, we don't need any more, no, don't hire them." (Wade Dep. 73:3-6; 73:18-20). Wade testified that it was clear Danny did not want any black dancers at Danny's. (Wade Dep. 71:4-10). According to Wade, Danny did not like black people. (*Id.*) He did not "want black girls there; he didn't want black customers there; he didn't even want Mexican customers there." (*Id.*) He told Wade he did not want any "N words in his club," and would fire black dancers who were not making a lot of money for the club. (Wade Dep. 71:13-22; 72:3-15).

Only black dancers were preventing from dancing after each other on the stage at Danny's. Wade testified that Danny did not want two sets of black girls going back to back on stage. (Wade Dep. 128:13-14). No matter the order that dancers check in, "there had to be a white person in between two sets of black girls. [She] couldn't put two black girls up, and then put two more black girls up behind those black girls." (Wade Dep. 128:12-19). White dancers regularly danced in back to back pairs. (Rayner Dep. 178:11-16).

Only black dancers were forced to work at Black Diamonds or be sent home. When Black Diamonds opened in 2013, only black dancers were forced to work the grand opening. (Williams Decl. ¶ 26; Garner Decl. ¶29; Riddle ¶ 31; Moss ¶ 27; Samuel ¶ 33). White dancers

were not required to work at Black Diamonds. (Samuel Decl. ¶ 47; Riddle Decl. ¶ 50; Moss Decl. ¶ 42; Williams Decl. ¶ 44; Garner Decl. ¶ 44).

Only black dancers were fined and/or sent home for refusing to work at Black Diamonds. Dax would repeatedly fine black dancers who refused to work at Black Diamonds. (Samuel Decl. ¶ 34; Moss Decl. ¶¶ 29, 41; Williams Decl. ¶¶ 26, 40: Riddle Decl. ¶¶ 34, 45,46; Garner Decl. ¶ 29). Dax would also send black dancers who refused to work at Black Diamonds home, sometimes multiple times a week. (Riddle Decl. ¶ 34; Garner Decl. ¶ 42). Because Dax never required white dancers at Danny's to work at Black Diamonds, he never fined any white dancers for refusing to work at Danny's. (Samuel Decl. ¶ 47; Riddle Decl. ¶ 50; Moss Decl. ¶ 42; Williams Decl. ¶ 44; Garner Decl. ¶ 44).

Only black dancers were forced to work at Black Diamonds or pay a fee to work at Danny's Downtown. Dax demanded that black dancers from Danny's either work at Black Diamonds or pay him money to work at Danny's. (Samuel Decl. ¶ 6; Williams Decl. ¶ 39; Garner Decl. ¶ 42). Williams' termination was a direct result of the discriminatory fines she was subjected to on the basis of her race. Her only fines at the end of her employment were related to her refusal to work at Black Diamonds. (Williams Decl. ¶ 41). Every time she refused, Williams was fined and sent home. (Williams Decl. ¶ 41). She was only forced to work at Black Diamonds because she was black. (Williams Decl. ¶ 44).

 Defendant's animus towards black individuals is also evident in the vulgar, derogatory, and racially offensive language frequently used by Dax and Danny Owens to refer to black people and anyone associated with them. Rayner quit Danny's after four years as a night manager based on Dax's racially offensive and vulgar language. (Rayner Dep. 129:6-130: 3). Dax called Rayner's then girlfriend Brittany Rayner, who is white, a "N-Lover" to her face for

having biracial children from a previous relationship. (*Id.*). Dax would frequently use derogatory language, such as "[b]lack bitches," and "Black Ass." (Garner Decl. ¶ 24).  Garner heard him call a white girl at Danny's a "'Nigger Lover' for having a black boyfriend." (*Id.*) Dax regularly referred to Moss and Riddle, who are biracial, as "half breeds." (Moss Decl. ¶ 23; Riddle Decl. ¶ 26). If anyone complained about Dax's language, he would tell them, "If you don't like it, leave." (Garner Decl. ¶ 24). Danny openly and frequently used the "N-Word." (Wade Dep. 76:2-10). Wade testified that if Danny saw a black customer, he would approach her and ask "why is that N word in here [?]" (Wade Dep. 21:76:3). Danny told Wade that he did not "want any N Words in his club," and Danny told "the security and the door girl at the time do not let [black customers] in at all no matter what." (Wade Dep. 71:19 – 72:2).

### C. Alternatively, the EEOC Has Established a Prima Facie Case of Racial Discrimination

To establish a *prima facie* case of discrimination under Title VII, the plaintiff can show: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) other similarly situated persons were treated more favorably. *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). Once the plaintiff establishes all elements of the *prima facie* case for discrimination, the burden shifts to the Defendant to state a legitimate non-discriminatory reason for the adverse treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If Defendant successfully meets its burden of articulating a non-discriminatory reason for the adverse treatment, the burden shifts back to the plaintiff to show the defendant's answer is merely a pretext for discrimination. *Id.*, at 804.

1. Williams and the Class Members Meet the First Two Elements of the McDonnell Douglas Standard

There is no question that Williams and the four class members belong to a protected class. (Williams Decl. ¶1; Moss Decl. ¶1; Samuel Decl ¶1; Riddle Decl. ¶1 Garner Decl. ¶1). Nor is there any legitimate dispute as to the qualifications of Williams and the class for their positions at the club. Each of them were deemed qualified by Danny's Downtown when the club hired them. (Rayner Dep. 63:13-15).

2. <u>Williams and the Class Members Suffered Adverse Employment Actions</u>

An "adverse employment action" refers to an action that affects the "terms, conditions, or privileges of employment." *Anderson v. Sikorsky Support Servs., Inc.*, 66 F. Supp. 3d 863, 870 (S.D. Tex. 2014)(citing *Young v. City of Houston*, 906 F.2d 177, 182 (5th Cir.1990)). A plaintiff must show that the employer made an "ultimate employment decision" to establish that the plaintiff has suffered an adverse employment action. *Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528, 531 (5th Cir. 2003). An "ultimate employment decision" includes hiring, discharging, promoting, compensating, and granting leave. *Id. See also Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642, 657 (5th Cir.2002) ("Adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.").

a. *The Black Dancer Quota Constituted an Adverse Action*

An employment action that affects the plaintiff's compensation constitutes an adverse employment action for purposes of Title VII. *Moore v. True Temper Sports, Inc.*, 2011 WL 5507401, at *2 (N.D. Miss. Nov. 10, 2011)

The undisputed testimony of Defendant's former managers, Williams and the class members establishes that black dancers were subject to a quota system that capped the number of black dancers that could dance on any particular shift. Once the limit was reached, all black

dancers who subsequently arrived at the club were sent home. Those dancers who were sent home lost the opportunity to earn money for that shift.

Each of the class members sent home as a result of the quota lost earnings. Adrea Samuel was sent home multiple times per week as a result of the black quota. (Samuel Decl. ¶¶23-26). Jordyn Riddle was sent home as a result of the quota. (Riddle Decl. ¶¶21-24). Latoria Garner was sent home several times a week due to the quota. (Garner Decl. ¶¶ 19-22). Ashley Williams was sent home multiple times a week because of the quota. (Williams Decl. ¶¶19-22)

>   b. *The Imposition of Fines on Ashley Williams to Work at Danny's Downtown Constituted an Adverse Action*

Williams' undisputed testimony establishes that she was charged money to work at Danny's over and above the regular club tip out imposed on all dancers. (Williams Decl. ¶¶38, 39). The levying of this fine diminished Williams' compensation and thus constituted an adverse employment action. *Moore v. True Temper Sports, Inc.*, 2011 WL 5507401, at *2 (N.D. Miss. Nov. 10, 2011)

>   c. *Forced Transfer to Black Diamonds Constituted an Adverse Action*

A forced job transfer may qualify as an adverse employment action where the working conditions are less favorable, less desirable, involves less interesting work, less responsibility, or less pay. *See Bell v. S. Delta Sch. Dist.*, 325 F. Supp. 2d 728, 737 (S.D. Miss. 2004)(citing *Forsyth v. City of Dallas*, 91 F.3d 769 (5th Cir.1996)).

The undisputed testimony establishes that Dax Owens required black dancers (1) to either work at Black Diamonds or be sent home—in some cases paying a fine in addition; (2) to work at Black Diamonds or pay a fine to dance at Danny's should they decline to work at Black Diamonds. Both (1) and (2) constitute adverse actions under Title VII.

The black dancers Dax forced to dance at Black Diamonds were not licensed to work at Black Diamonds. They were only licensed to work at Danny's. (Williams Decl. ¶1; Moss Decl. ¶39 40; Samuel Decl. ¶44; Riddle Decl. ¶6 Garner Decl. ¶4). Forcing those dancers to dance at Black Diamonds placed each of them in danger of being arrested and jailed for working at Black Diamonds without a license. When black dancers declined to work at Black Diamonds, they were sent home and lost the opportunity to earn any money.  Being fined on top of that obviously affected their compensation. Black dancers were thus placed in a no-win situation that white dancers were not placed in—either work at Black Diamonds and risk getting arrested and jailed or lose the ability to earn any money for the night and face a possible fine in addition. When Dax offered black dancers the option of working at Black Diamonds or pay a fine to work at Danny's, this too adversely affected their compensation. They were forced to risk arrest and jail time by working at Black Diamonds or pay a fine to work at Danny's Downtown.

The record is clear that the working conditions at Black Diamonds were substantially inferior to the working conditions at Danny's Downtown. (Williams Decl. ¶¶29-35; Samuel Decl. ¶¶ 37-43; Riddle Decl. ¶¶ 37-44; Garner Decl. ¶¶32-38). Black Diamonds did not have working air conditioning, while Danny's did. Black Diamonds was less safe for the dancers than Danny's Downtown: the security (including security personnel and cameras) at Danny's Downtown was omnipresent, while Black Diamonds had little security presence. Black Diamonds had no security cameras. Illegal drug use was tolerated at Black Diamonds, while illegal drug use was not tolerated at Danny's Downtown. The job was also less desirable because dancers earned less money at Black Diamonds. The clientele did not spend money to the same degree as Danny's Downtown customers. At Danny's, dancers had the ability to earn money

through private VIP dances and stageside tipping. (Brittany Dep. 92:16-93:8). Black Diamonds did not have offer private VIP dances. (Wade Dep 119:4-14).

Williams and each of the class members were adversely affected in terms of compensation and substantially inferior working conditions as a result of Dax's requirement that they (1) work at Black Diamonds or go home (and, some cases, pay a fine in addition) or (2) work at Black Diamonds or pay a fine to work at Danny's. Each class member experienced some combination of (1) and (2). (Williams Decl. ¶¶15-45; Samuel Decl. ¶¶ 20-49; Riddle Decl. ¶¶ 17-52; Garner Decl. ¶¶15-47, Moss Decl. ¶¶ 16-44)

> ### d.   Williams' Termination Constituted an Adverse Action

Termination is an ultimate employment action and therefore constitutes an adverse action. *Hernandez v. Crawford Bldg. Material Co*., 321 F.3d 528, 531 (5th Cir. 2003).

Ashley Williams was sent home multiple times for declining to work at Black Diamonds. Each time she was sent home she paid a fine. Dax terminated her for refusing to pay a $100 fee to work at Danny's Downtown after she refused to work at Black Diamonds. (Williams Decl. ¶¶41-42).

3. <u>Similarly Situated White Dancers were Treated More Favorably</u>

The undisputed record establishes that, as to each of the adverse actions set forth above, similarly situated white dancers were treated more favorably. First, Danny's Downtown imposed no quota on white dancers. White dancers could work whatever shifts they wanted, whenever they wanted. This provided white dancers greater earning opportunities than black dancers. Second, Danny's Downtown did not force or coerce any white dancers to work at Black Diamonds. White dancers could work at Black Diamonds if they chose to do so, but they were

not forced to under penalty of being fined or sent home or both. Nor were any white dancers forced to pay money, like Williams, in order to work at Danny's Downtown.

Thus, white dancers were free to arrange their schedules and dancing locations in a manner that maximized their earning opportunities, while black dancers' earning opportunities were artificially constrained by management of Danny's Downtown, because of their race.

In the case of Ashley Williams' termination, she was terminated by Dax for refusing to pay $100 to work at Danny's Downtown. The reason for the levying of the fine was Williams' refusal to work at Black Diamonds. (Williams Decl. ¶¶38-42). Because only black dancers were forced, the underlying reason for Williams' termination was her race.

### D. Defendant Has Not, and Cannot, Rebut the EEOC's Prima Facie Case of Discrimination

Defendant has not articulated any legitimate non-discriminatory reason for its actions. Defendant has suggested that both white dancers and black dancers at Danny's were subjected to fines. This argument misses the point as it is not disputed that both black dancers and white dancers could be subjected to fines for a variety of infractions at Danny's Downtown.

Instead, the EEOC's disparate treatment claim rests on several undisputed facts: (1) only black dancers were forced to work at Black Diamonds or be sent home; (2) only black dancers were forced to work at Black Diamonds or be sent home and fined; (3) only black dancers were forced to work at Black Diamonds or pay a fee to work at Danny's Downtown; (4) only Black dancers were subject to a race based quota that limited their earning opportunities; and (5) Ashley Williams was terminated for refusing to pay a fee that was levied on her for declining to work at Black Diamonds, a fine which was only levied on black dancers.

Where the Defendant fails to articulate a legitimate, non-discriminatory reason for its disparate treatment, the inference flowing from the Plaintiff's prima facie case "stands

unrebutted, and discrimination is established." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1062 (11th Cir. 1994). *See also*, *Alvarado v. Texas Rangers*, 492 F.3d 605, 618 (5th Cir.2007)(noting that where defendant had not satisfied its burden of production as to a legitimate non-discriminatory reason, the *prima facie* case "pretermits summary judgment dismissal of the plaintiff's action leaving the ultimate question of discriminatory animus to be determined by the trier of fact."). Here the EEOC has more than established—and there is no genuine issue of fact—as to discriminatory animus.

## IV.  CONCLUSION

For the foregoing reasons, the EEOC respectfully requests that the Court grant Plaintiff's Motion for Partial Summary Judgment as to Liability.

Dated: February 6, 2018

Respectfully submitted,

**MARSHA L. RUCKER**
Regional Attorney
PA Bar No. 90041

*/s/Alysia D. Franklin*
**ALYSIA D. FRANKLIN**
Trial Attorney
CA Bar No. 264410
alysia.franklin@eeoc.gov

**CHRISTOPHER WOOLLEY**
Trial Attorney
CA Bar No. 241888
christopher.woolley@eeoc.gov

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
1130 22nd Street South
Suite 2000

Birmingham, AL 35205
Phone: (205) 212-2064

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2018, I filed the foregoing with the Clerk of Court using the CM/ECF system which will electronically send notification of the filing to all attorneys of record.

_/s/ Alysia D. Franklin_
Alysia D. Franklin