**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**


**EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION**                                                                                  **PLAINTIFF**

**v.**                                              **Civil Action No. 3:16-CV-00769-HTW-LRA**

**DANNY'S RESTAURANT, LLC AND
DANNY'S OF JACKSON, LLC F/K/A
BABY O'S RESTAURANT, INC. D/B/A
DANNY'S DOWNTOWN CABARET**                                              **DEFENDANTS**

_____

**ORDER ON MOTION FOR SUMMARY JUDGMENT
AS TO LIABILITY**

---

Before the court is the Motion for Summary Judgment as to Liability filed by the

Plaintiff, United States Equal Opportunity Employment Commission (hereafter "EEOC") **[doc.

no. 81].**  Defendant, Danny's of Jackson, LLC (hereafter "Danny's of Jackson" or "Defendant")

opposes the motion.  The parties have completed their briefing on the motion and this court is

prepared to rule.

This lawsuit is an enforcement action brought by the EEOC under the auspices of Title

VII of the Civil Rights Act of 1964[1], as amended, and the Civil Rights Act of 1991, to correct

allegedly unlawful employment practices of the Defendant based on race.  The suit seeks relief

on behalf of Ashley Williams and a class of Black female exotic dancers (hereafter referred to

collectively as 'complainants') who worked at Danny's Downtown Cabaret (also referred to as

---

[1] 42 U.S.C. §2000e, et seq

"Danny's") and allegedly were subjected to disparate terms and conditions of employment based on their race. The Defendant, Danny's of Jackson, is the owner of Danny's Downtown Cabaret, a "strip club" located on S. West Street in Jackson, Mississippi. Danny McGee Owens (hereafter "Owens") is the only member of Danny's of Jackson, LLC.

## I. PROCEDURAL HISTORY

### A. PRIOR LITIGATION

Danny's Downtown Cabaret was the subject of a previous EEOC lawsuit. Sherida Edwards, (hereafter "Edwards"), a dancer who worked for the club beginning in 2009, filed a charge with EEOC alleging that she and the other Black dancers were required to adhere to a schedule that required them to work certain days and shifts. If they missed their assigned shift, said Edwards, they were fined $25.00. White dancers, according to Edwards, were not made to comply with a schedule and were not fined for missing any certain days. White dancers, she said, could set their own schedules, choosing to work on whatever days they wanted. This schedule had the effect of limiting the number of Black dancers who worked on any given shift. Edwards filed her charge of discrimination with the EEOC in April of 2011 and an amended charge in October, 2011.

After its investigation, EEOC made the following findings.

The Commission's investigation revealed that Respondent employed substantially fewer black dancers than white dancers, limited the number of black dancers who could perform on a single shift, and required black dancers to work an assigned schedule. The failure by black dancers to comply with that schedule resulted in financial sanctions. Respondent did not subject white dancers to the same terms and conditions of employment as Respondent imposed on black dancers. Subsequent to Charging Party filing her initial charge with the Commission on April 18, 2011, Respondent subjected her to a relentless pattern of harassment and threats. Respondent also adversely limited Charging Party's work schedule.

*EEOC Determination.* [doc. no. 81-9 at p. 2]

The EEOC additionally concluded that there was reasonable cause to believe that a class of Black employees had been subjected to disparate terms and conditions of employment because of race and that the charging party had suffered realiation and constructive discharge, all in violation of Title VII. [doc. no. 81-9 at p. 2]

On September 28, 2012, the EEOC filed suit against Baby O's Restaurant, Inc., the owner of Danny's Downtown Cabaret at that time. *Equal Employment Opportunity Commission v. Baby O's Restaurant, d/b/a Danny's,* Civ. No. 3:12-cv-681 (S.D Miss. Sept. 28, 2012). The suit was settled by consent decree on June 28, 2013. The EEOC filed a motion on December 18, 2014, for civil contempt against Baby O's for allegedly violating the terms of the consent decree. That motion was resolved by entry into an *Amended* Consent Decree on January 26, 2016. By September of that same year, EEOC had filed another motion for contempt against Baby O's for failure to comply with the Amended Consent Decree. This proceeding was also resolved by mutual agreement, resulting in a *Second Amended* Consent Decree in March of 2017. Tellingly, this Second Amended Consent Decree was entered into and signed by Danny McGee Owens as president of Danny's Of Jackson, LLC. Civ. No. 3:12-cv-681 [doc. no. 42].

## B. THE CURRENT CHARGE

In August of 2013, shortly after the entry of the first consent decree in the previous suit, Ashley Williams filed her charge with the EEOC. *Williams EEOC charge* [doc. no. 79-17]. Williams' charge alleged that she had been discriminated against because of her race and that she was fired from her position for refusing to work at Black Diamonds. This was a strip club recently opened by Owens' son, Danny Daxon Owens (hereafter "Dax"), across the street from Danny's Downtown Cabaret. Notice of the charge was sent to Dax, Manager of Danny's Downtown Cabaret, who, in turn, informed Owens, his father. *Affidavit of Daniel Daxon Owens*

[doc. no. 81-11]. The EEOC issued a Letter of Determination on June 2, 2016, finding reasonable cause to believe that the Defendants had violated Title VII. *EEOC Letter of Determination* [doc. no. 81-13].

At the conclusion of its investigation, EEOC issued its letter of determination, dated June 1, 2016, which included the following:

> Examination of the evidence revealed that Respondent treated Williams and a class of other black female entertainers in a discriminatory manner and subjected them to segregated working conditions. Specifically, Respondent assigned Charging Party and a class of black dancers to work at Black Diamonds. The assignment at Black Diamonds paid significantly less than comparative assignments at Danny's. Moreover, Charging Party and a class of blacks were subjected to harsher disciplinary action than similarly situated White entertainers in the form of excessive fines.
>
> Based on its investigation the Commission has concluded there is reasonable cause to believe discrimination occurred because Charging Party and a class of black female employees were subjected to disparate terms and conditions of employment by Respondent in violation of Title VII.

*EEOC Determination Letter* [doc. no. 81-13 at p. 3]

Efforts at conciliation failed and on July 29, 2016, the Plaintiff issued to Defendants a Notice of Failure of Conciliation. On behalf of the complainants, the EEOC filed the instant lawsuit on September 30, 2016.

This suit initially was brought against Danny's Restaurant, LLC, as well as against Danny's of Jackson, LLC. Danny's Restaurant, LLC did not file an answer nor enter an appearance in this cause, and the Clerk of Court entered default against it on August 24, 2017, [doc. no. 41]. The only remaining Defendant is Danny's of Jackson, LLC, formerly known as Baby O's Restaurant, Inc., doing business as Danny's Downtown Cabaret.

In this lawsuit, Plaintiff seeks, *inter alia,* injunctive relief; back pay with prejudgment interest for Ashley Williams, the complainant terminated by the Defendants; compensation for past and future pecuniary losses, compensation for past and future and non-pecuniary losses; and other affirmative relief to make all of the complainants whole. Plaintiff also asks for punitive damages for what it alleges to be malicious and reckless conduct.

The EEOC filed this motion, in accordance with Rule 56 of the Federal Rules of Civil Procedure, for summary judgment as to liability on the claims asserted by the EEOC. This court has previously granted partial summary judgment motions finding that the dancers working at Danny's Downtown Cabaret are "employees" of the club as opposed to "independent contractors", and that Danny's of Jackson, LLC is the successor in interest to Baby O's Restaurant, Inc., for purposes of liability.

EEOC contends that it has produced direct evidence of unlawful discrimination on the basis of race and that no genuine issue of fact exists on any of the issues of liability. Danny's of Jackson opposes the motion and denies that it is liable for the alleged violations of Title VII, because, says Danny's of Jackson, the complainants did not suffer any adverse employment action and were not subjected to disparate terms and conditions of employment.

## II. FACTUAL BACKGROUND

### A. THE OWNERS

Danny McGee Owens (hereafter "Owens"), already the owner of a strip club in Memphis, Tennessee, opened a strip club in Mississippi on Lakeland Drive in Jackson. The club was later moved to the downtown Jackson area.

Following a felony conviction, Owens was incarcerated with the Federal Bureau of Prisons from 1992 to 2016. At the time Ashley Williams filed her charge with the EEOC on

August 2, 2013, Owens was in prison, and his son, Danny "Daxon" Owens, (hereafter "Dax") was the general manager of the club, which was operating as Danny's Downtown Cabaret on South West Street in Jackson, Mississippi. Dax was the general manager during the period relevant to the complaints of discrimination *sub judice.* According to Michael Rayner and Owens' 30(b)(6) deposition [doc. no. 81-7], Dax was the general manager of Danny's Downtown Cabaret from 2010 until 2016. Despite being incarcerated during this period, however, Owens remained deeply involved in the operations of the club. See *B. Rayner Dep.* 62:25-63:1 [doc. no. 79-15 pp.18-19]; *Wade Dep.* 24:11-24 [doc. no. 79-14 at pp. 8-9].

After Owens' release from prison in 2016, he formed Danny's of Jackson LLC. His son Dax was originally listed as a member of the LLC but that was later changed to reflect that Owens is the sole member. The assets of Danny's Downtown Cabaret were transferred from Baby O's Restaurant, Inc., to Danny's of Jackson. Owens subsequently replaced Dax in the management role over the club.

## B. OPERATIONS OF DANNY'S DOWNTOWN CABARET

Plaintiff's brief describes the physical layout of the club. Deposition testimony and declarations of former employees support this description. The Defendant does not dispute any of the description provided.

The club has one main stage and several satellite stages where the dancers perform to music. On nights when a lot of dancers perform, they may dance in pairs on stage. They generally perform in the same order as they arrived and checked in. The EEOC contends, however, that Dax or Owens oftentime would depart from this procedure when too many Black dancers appear. This matter will be discussed in more detail later. The dancers receive tips for their performances; these tips are their only compensation for the stage dances.

Private areas are positioned around the perimeter of the club, called VIP areas. At these venues, the dancers treat their guests to more private dances, in exchange for set fees established by club management. In addition to these VIP rooms, other rooms are provided for a higher dance fee of $100 or $300. For safety purposes, these areas feature cameras.

Customers are required to pay a fee at the door to enter. These patrons are generally seated at tables on the open floor area where they can watch the dancers and consume drinks. Dancers may circulate around the floor, in and among the tables, to solicit drinks and private dances. Waitresses also circulate among the tables to take drink orders. Managers and security personnel walk the floor as well, to keep track of the number of dances each performer is selling, and for security purposes. A small bar area with seating sells beer.

The club schedules two shifts per day. The day shift begins in the early afternoon. Fewer customers and employees are present during the day. Night shifts are more lucrative; more customers are present. Thursday, Friday and Saturday nights are the most profitable nights. The night shift begins at 7:00 p.m. Dancers wanting to dance that night must arrive by 11:00 p.m. The club closes around 2:00 a.m., or later, on busy nights. Generally, the performers have no set work schedules, except for the schedules applied to the Black dancers, as will subsequently be discussed in more detail.

Brittany Rayner said in her deposition:

Q: Okay. And how was it decided which dancers danced on day or night shift? How was that decided?

A: It's just who showed up.

Q: Okay.

A: There – there wasn't a – that's how come some nights you might have five girls and 50 customers, some nights you might have 40 girls and three customers...

*Brittany Dep*. 48:18-25 [doc. no. 81-4].

Once they report for work, the dancers must remain and work for at least six hours, or they will be required to pay a fine. Dancers earn their compensation from the tips for stage performances and from the fees charged for private dances. The performers pay a part of the money earned from the private dances back to the club. The club sets the fees for private dances. A dancer may charge more, but cannot charge less. The night manager prepares a "dance sheet" which lists each dancer's name, race, and number of dances sold that shift. At the end of the shift, the manager collects the club's cut of all the private dances sold by each dancer. *M. Rayner Dep*. pp. 47-49 [doc. no. 81-3].

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *Copeland v. Nunan,* 250 F.3d 743 (5th Cir. 2001); see also *Wyatt v. Hunt Plywood Company, Inc.,* 297 F.3d 405, 408–09 (2002). When assessing whether a dispute to any material fact exists, all of the evidence in the record must be considered, but the court must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); instead, the court is to "draw all reasonable inferences in favor of the nonmoving party." *Id*.; *Wyatt*, 297 F.3d at 409. All evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc*. 369 U.S. 654, 655 (1962).

A party, however, cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or "only a scintilla of evidence." *TIG Ins. Co. v. Sedgwick James of Wash.* 276 F.3d 754, 759 (5th Cir. 2002); *S.E.C. v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). Summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. DISCUSSION

### A. EVIDENCE OF DISCRIMINATORY TREATMENT OF BLACK DANCERS

EEOC asks this court to determine, as a matter of law, that Danny's of Jackson, LLC is liable for acts of discrimination committed in violation of Title VII. This court now undertakes that analysis. The court first looks at the discriminatory actions alleged, the impact on the complainants and the proof, if any, that these actions occurred.

### 1. Only Black Dancers Were Subjected to a "Schedule"

According to several of the deponents, in the past, the managers at Danny's Downtown Cabaret had created for Black dancers a schedule which limited the number of Black dancers on any given shift. *Rayner Dep.* [doc. no. 81-3 at pp. 41-45]; *Declaration of Latoria Garner* [doc. no. 81-14 at ¶ 16] Black dancers were only allowed to work during their scheduled shifts, and if a Black dancer did not show up for her scheduled shift, she was fined. White dancers were not required to schedule their work shifts in advance, but were free simply to appear for shifts at their discretion; nor were they threatened with fines for not showing up on any certain days. This "Black dancer schedule" was one of the matters complained of by Sherida Edwards in her EEOC charge in 2011. This policy seemingly changed as a result of the prior charge and

litigation. Unfortunately, according to the testimony, it was replaced with a "Black quota".
*Wade Dep.* [doc. no. 88-7 at pp. 77-78]. *Declaration of Latoria Garner* [doc. no. 81-14 at ¶ 17].

The Defendant, Danny's of Jackson, filed a Response [doc. no. 90] and Memorandum in
Opposition to EEOC's motion [doc. no. 91], but did not submit any factual evidence to refute the
evidence submitted by EEOC regarding the alleged schedule for Black dancers. on this point.

## 2. Only Black Dancers Were Subjected to a Quota

Once the written schedule was eliminated, the Black dancer quota became another way of
limiting the number of Black dancers on a shift. No limit on Black dancers was pre-set; instead
the number of Black dancers who could dance on a given night depended on how many White
dancers were present. The race of each dancer was listed on the dance sheets along with names,
check-in times and the number of dances sold. This enabled the managers to inform Dax or
Owens how many Black dancers were present on any night.

Michael Rayner was a manager at Danny's from around 2010 to 2014. Dax would inform
Rayner if there were too many Black girls, he [Rayner] was to send some home. Rayner was
fearful of consequences if he did not comply, which could include verbal reprimands or being
assigned to less desirable shifts. *Rayner Dep*.113-118 [doc. no. 81-3].

Latoria Garner describes it this way.

18. When dancers signed in at the beginning of their shift, the managers completed
a form that listed the dancer's name, time of arrival, and race.
19. Dax would require the managers to count the number of black dancers to
determine if some of them needed to be sent home.
20. If Dax determined that there were "too many" black dancers working on a
particular shift, he would either send some of the black dancers home himself or
tell his manager to send black dancers home.
21. I witnessed him do this a few times a week.

22. I myself experienced being sent home on approximately three times a week because there were too many black girls working on a particular shift. When I was sent home, I was not able to work and lost all potential earnings for that shift.

23. Dax did not impose a quota on the number of white dancers who could work on a particular shift. Nor did he send white dancers home because there too many white dancers working on a particular shift.

*Garner Decl.* [doc. no. 81-14 ¶¶ 18-23].

Allison Wade worked at Danny's Downtown Cabaret from July of 2012 to December of 2016. She worked in a variety of roles: waitress, door girl, and night manager. While Wade was a door girl, Owens would call her from prison every night to inquire about the club's numbers. He would, she stated, specifically want to know how many Black dancers were working and how many Black people were in the club. Some nights she would get a call from Dax, who generally came in later, similarly inquiring about the number of Black dancers. If too many, he would tell her "if any more Black dancers come in, tell them they can't dance tonight." *Wade Dep.* 34, 93,94,98 [doc. no. 88-7]. Wade says she was never told to limit the number of White dancers.

After Owens was released from prison in 2016, he began managing the club. Wade says he fired a lot of the Black dancers and he made it clear to her that he did not want *any* Black dancers in his club, although he would keep those Black dancers who were the "real money makers." *Wade Dep*. pp.71-72, 76 [doc. no. 88-7].

Brittany Raynor (hereafter Brittany) was another witness who was formerly employed at Danny's Downtown Cabaret. Initially hired as a waitress in 2012, Brittany also worked as a bartender, door girl, dancer and occasionally as a day shift manager. She left in 2014. She was instructed by Dax how to check in dancers at the beginning of the shift, and that included writing down the race of each dancer. Brittany discussed the Black quota in her deposition. That quota was driven by the ratio of White to Black dancers. Brittany heard Dax tell the night manager

11

that the club has "too many Black girls so you need to send so and so home." *Brittany Dep*. 69:13-16 [doc. no. 81-4]. Black dancers that were sent home were not able to work at all, she said. Brittany never heard Dax send any White dancers home.

The Defendant, Danny's of Jackson, filed a response and memorandum in opposition to EEOC's motion for summary judgment on the issue of liability, but did not respond with any factual evidence to refute the evidence submitted by EEOC regarding the "Black quota".

### 3. Only Black Dancers Were Forced to Work at Black Diamonds

In 2013, Dax opened another strip club across the street from Danny's Downtown Cabaret called "Black Diamonds." *M. Rayner Dep*. 135:1-15 [doc. no. 81-3]. According to the complainants'' declarations, this club was meant to appeal to Black customers. *Garner Decl* [doc. no. 81-14, ¶ 28]; *Williams Decl.* [doc. no. 81-16, ¶ 25]: *Riddle Decl.* [doc. no. 81-17, ¶ 30]; *Samuel Decl.* [doc. no. 81-2, ¶ 30]. Shortly before Black Diamonds was scheduled to open, Dax informed all of the Black dancers that they were going to work the grand opening of Black Diamonds. If they refused, Dax told them, they would be fined. Dax fined the Black dancers who refused to work there up to $250.00. These fines were put on the books at Danny's Downtown Cabaret, and the Dancers were required to make payment toward those fines to Danny's before being allowed to work a shift at Danny's. See, e.g., *Moss Decl.* [doc. no. 81-5 ¶¶ 27 -28]; *Williams Decl.* [doc. no. 81-16, ¶ 26]: *Riddle Decl.* [doc. no. 81-17, ¶¶ 31-33].

The working conditions at Black Diamonds were inferior to those of Danny's Downtown Cabaret. The facility was not as nice. At the grand opening, which occurred in the summer, the air conditioning was not working. Leaks from the ceiling caused pools of water to accumulate on stage. The dancers complained of being hot and uncomfortable, and in fear of slipping and falling. The club had fewer employees and less security, causing the dancers to feel unsafe, as

issues frequently arose with customers that required the intervention of security, or other personnel.

Earnings for the Black dancers were significantly reduced at Black Diamonds. Private rooms were non-existent. No private dances were allowed. The dancers at Black Diamonds were wholly dependent on their tips from stage performances. Dancers at Black Diamonds, therefore, had less potential income. *Brittany Dep.* 92:12-20 [doc. no. 81-4]; *Wade Dep*. 133, 119 [doc. no. 81-6]; *Samuel Decl.* [doc. no. 81-2, ¶¶ 38-41]; *Moss Decl,,* [doc. no. 81-5, ¶¶ 33-37]; *Williams Decl*. [doc. no. 81-16, ¶¶ 30-34]; *Garner Decl.* [doc. no. 81-14 ¶¶ 33-36].

Coincidentally, or not so coincidentally, the opening of Black Diamonds also provided a means for limiting the number of Black dancers at Danny's Downtown Cabaret. The procedure for effectuating the "Black quota" at Danny's changed. When there were too many Black dancers at Danny's, the manager simply made them go across the street to dance at Black Diamonds, instead of being sent home. Those Black Dancers who refused to work at Black Diamonds were subjected to fines, being sent home or having to pay to come to work at Danny's.

Dax, as earlier stated, would fine Black dancers who refused to work at Black Diamonds. The amounts of the fine would vary. Dax would send Black dancers who refused to work at Black Diamonds home. Dax would require Black dancers to pay him money to work at Danny's. *Samuel Decl.* [doc. no. 81-2 ¶¶ 6, 34, 47]; *Moss Decl.* [doc. no. 81-5, ¶¶ 29,41,42]; *Williams Decl.* [doc. no. 81-16, ¶¶ 26, 40, 44]; *Riddle Decl*. [doc. no. 81-17 ¶¶ 33-34, 45-50]; *Garner Decl.* [doc. no. 81-14 ¶¶ 29, 41-42, 44].

Michael Rayner says he was aware that some ladies were charged money to come over from Black Diamonds to Danny's. White dancers were not required to work at Black Diamonds

and were not fined for refusing to work at Black Diamonds; nor did they have to pay in order to be allowed to work at Danny's instead of Black Diamonds. *M. Rayner Dep.* 142:24-143:10 [doc. no.81-3].

The dancers who work at adult entertainment clubs of this type are required to be licensed. The license must be specific to the club where the dancers are employed. When Dax forced the Black dancers from Danny's Downtown Cabaret to work at Black Diamonds, these dancers were only licensed to work at Danny's. Because they were not licensed to work at Black Diamonds, they were placed in danger of being arrested.

Additionally, after Black Diamonds opened, Danny's Downtown Cabaret would not accept applications from Black dancers. Brittany Rayner and other managers were instructed by Dax that potential Black dancers should not be given an application to dance at Danny's but should be referred, instead, to the manager at Black Diamonds. *Brittany Dep.* 77-78 [doc. no. 81-4].

The Defendant, Danny's of Jackson, filed a response and memorandum in opposition to EEOC's motion for summary judgment on the issue of liability, but did not respond with any factual evidence to refute the evidence submitted by EEOC regarding the Black dancers being required to dance at Black Diamonds.

## B. EVIDENCE OF DISCRIMINATORY TREATMENT OF COMPLAINANTS

### 1. Ashley Williams

Ashley Williams ("Williams") was employed as a dancer at Danny's from September of 2012 until July of 2013. As she describes in her declaration [doc. no. 81-16], during her employment, she was subjected to discrimination based on her race. She also witnessed discrimination against other dancers and customers because of race. Black customers , she says

were charged more to enter Danny's than White customers. Williams was subjected to a Black dancer quota and was sent home multiple times a week because "too many Black girls" were there. She was forced to work at Black Diamonds for the grand opening and on two other occasions. On those two occasions Williams earned significantly less than she would have earned at Danny's during the same shift. Dax required Williams to pay to work at Danny's. Williams was sent home multiple times for refusing to work at Black Diamonds. Each time Williams was sent home, she was fined. Each time Williams was sent home, she was unable to work and lost all her potential earnings for the lost shift at Danny's. By the time of her termination, Williams' only fines were a direct result of her refusal to work at Black Diamonds. Williams was fired when she refused to pay Dax $100 upfront to dance at Danny's. The $100 allegedly owed was due to a fine that had been imposed on Williams for refusing to dance at Black Diamonds. *Williams Decl.* [doc. no. 81-16].

### 2. Latoria Garner

Latoria Garner ("Garner") was hired in 2006 as a dancer at Danny's. Garner was subjected to discrimination on the basis of her race at Danny's. Dax was the General Manager of the club from the time she was hired until he stopped managing Danny's in 2016. When Garner began working at Danny's in 2006, the club had in place a specific schedule just for Black dancers. Dax would schedule and limit Garner, and other Black dancers, to specific shifts three to four days a week. After the Black schedule ended, Garner's shifts were limited by the Black quota system. Garner was sent home a few times a week because of this limit on the number of Black dancers.

Dax used derogatory language and racial slurs openly, such as "Black Bitches," "Black Ass," and "Nigger Lover". Garner was forced to dance at the Black Diamonds grand opening.

During the grand opening, Garner made substantially less money than she would have made at Danny's during the same shift. After the grand opening, Garner refused to work at Black Diamonds again and was sent home a few nights a week for her refusal. Each time Garner returned to work at Danny's, Dax would try to force Garner to pay him money upfront before he would allow her to dance. *Garner Decl.* [doc. no. 81-14].

### 3. Sharday Moss

Sharday Moss ("Moss") was hired as a dancer at Danny's in August of 2012. Dax was the General Manager from the time of Moss's hire until his departure in 2016. Moss has been subjected to discrimination on the basis of her race during her employment at Danny's. Moss witnessed other Black dancers being sent home regularly due to the Black dancer quota. Dax referred to Moss and her sister, Riddle, as "half breeds." Moss was forced to dance at the Black Diamonds' grand opening. After the grand opening, Moss refused to work at Black Diamonds again. As a result, Dax fined Moss. *Moss Decl.* [doc. no. 81-5].

### 4. Jordyn Riddle

Jordyn Riddle ("Riddle") was hired in February of 2013. Dax was the General Manager during Riddle's entire tenure at Danny's. Riddle was subjected to discrimination on the basis of her race while working at Danny's. Riddle was sent home because there were "too many" Black girls working on a particular shift. Dax told Riddle that her hair was too "ethnic," and on at least one occasion sent Riddle home because her hair was too curly. Whenever Riddle was sent home, she lost all potential earnings for that shift. Riddle was forced to work at Black Diamonds' grand opening. Riddle earned substantially less at Black Diamonds than she did at Danny's during the same shift. After the grand opening, Riddle refused to dance at Black Diamonds. Dax threatened to fine her every time she refused and to not allow Riddle to work anywhere else. To avoid

Dax's threatened fines, Riddle reluctantly danced at Black Diamonds an additional six or seven times. Each time Riddle worked at Black Diamonds, she made very little money. To avoid being fined or forced to work at Black Diamonds, Riddle switched from the night shift to the day shift at Danny's. This switch had a significant financial impact on Riddle because the day shift had fewer customers and was therefore less lucrative for dancers. *Riddle Decl.* [doc. no. 81-17].

### 5. Adrea Samuel

Adrea Samuel ("Samuel") was hired as a dancer at Danny's in late 2011/early 2012. Samuel was subjected to discrimination on the basis of her race while working at Danny's. Dax was the General Manager from the time of Samuel's hire until his departure in 2016. Danny's limited the number of Black dancers who could work on any given shift and Samuel was a victim of this Black dancer quota. Samuel was sent home multiple times a week as a result of this Black dancer quota. As a result of being sent home, Samuel lost any potential earnings for that shift. Samuel was forced to work Black Diamonds' grand opening. Samuel was forced to work at Black Diamonds twice after the grand opening, and earned substantially less money than should would have made at Danny's during the same shift. *Samuel Decl.* [doc. no. 81-2].

## C. EVIDENCE OF DISCRIMINATORY ANIMUS

### 1. Discriminatory Treatment of Black Customers at Danny's Downtown Cabaret

In addition to limiting the number of Black dancers, Dax charged Black customers more than White customers. Rayner was uncomfortable with this and would instruct door staff to not do it "if they could get away with it without getting in trouble." *M. Rayner Dep*. 125-26, 154:4-8 [doc. no. 81-3]. Each cash register included buttons for Black, White and Other. *Rayner Dep*. 121:7-12 [doc. no. 81-3]; *Cash Register Photo* [doc. no. 81-15]. Brittany Rayner was also aware

that Dax instructed Michael Rayner to charge Black patrons more than White patrons. *Brittany Dep*. 71:7-19 [doc. no. 81-4].

Alison Wade ("Wade") worked at Danny's from July of 2012 to December of 2016. During her time at Danny's, Wade worked as a waitress, door girl and eventually the night shift manager. As a door girl, Wade was responsible for processing paperwork and keeping track of everything from dancer arrival times to the race of Danny's customers. (Wade Dep. 17:21-18:7). As the door girl, Wade checked in customers. Both the cash register at the front door and the cash register at the bar included buttons to indicate whether a customer was "Black, White or Other." *Cash Register Photo* [doc. no. 81-15]. The cash registers contained buttons for "Black, White or other" during Wade's entire employment at Danny's. While Wade was a door girl, Owens would call her from prison to inquire about the club's numbers and want to know how many Black people were in the club, how many dancers were working, etc. *Wade Dep.*14-17, 22, 34, 93-94, 98:11-15 [doc. no. 81-6].

The Defendant, Danny's of Jackson, filed a response and memorandum in opposition to EEOC's motion for summary judgment on the issue of liability, but did not respond with any factual evidence to refute the evidence submitted by EEOC regarding the differences in treatment of Black patrons and White patrons.

### 2. Derogatory and racially offensive language

Defendant's animus towards African Americans is evident in the derogatory and racially offensive language frequently used by Dax and Owens to refer to the Black dancers, Black customers and Black people in general. White employees who had been romantically involved with Black men were castigated and called "N-----" lovers. Michael Rayner quit Danny's Downtown Cabaret after four years as a night manager because of Dax's racially offensive and

vulgar language and policies. (Rayner Dep. 129:6-130: 3). Dax called Rayner's then girlfriend Brittany Rayner, who is White, a "N----- Lover" because she had bi-racial children from a previous relationship. Garner heard him call a White girl at Danny's a "'N----- Lover' because she had a Black boyfriend. (Garner Decl. ¶ 24). Dax would frequently use derogatory language, such as "[b]lack bitches," and "Black Ass."." (*Id.)* Dax regularly referred to Moss and Riddle, who are biracial, as "half breeds." (Moss Decl. ¶ 23; Riddle Decl. ¶ 26). Owens openly and frequently used the "N-Word." (Wade Dep. 76:2-10). Wade testified that if Owens saw a Black customer, he would approach her [Wade] and ask "why is that N----- in here [?]" Wade Dep. 21:76:3 [doc. no.  ]. Owens told Wade that he did not "want any N------s in his club," and instructed security and the door girl at the time not to let any Black customers in at all, "no matter what." (Wade Dep. 71:19 – 72:2).

Not only were the vast majority of customers at Danny's Downtown Cabaret White, Brittany Rayner, a former waitress, bartender, dancer and manager for the club, testified that she never saw any Black managers, waitresses, front door staff or bartenders while she worked there, and that the vast majority of dancers were White. *Brittany Dep*. pp.45-47 [doc. no. 81-4]

As previously stated, Danny's of Jackson has not submitted evidence to dispute that presented by the EEOC relative to any of the issues discussed, including Dax's and Owens' use of racially derogatory language.

## V. LAW AND ANALYSIS

Title 42 U.S.C. § 2000e-2(a)(1 ) provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national

origin . . ." [2] A plaintiff in a Title VII case may prevail upon showing, by a preponderance of the

evidence, that the discrimination was "a motivating factor" in the employment decision even

though other factors may also have motivated the decision. 42 U.S.C. § 2000e-2(m); [3] See

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015) (although the phrase

"because of" "typically imports, at a minimum, the traditional standard of but-for causation," this

standard is relaxed under Title VII "to prohibit even making a protected characteristic a

'motivating factor' in an employment decision").

The Plaintiff EEOC contends that the complainants' race was the motivating factor in the

Defendant's adverse employment actions against complainants. Further, says EEOC, it has

provided *direct* evidence of discriminatory treatment and, therefore, is not subject to the

McDonnell Douglas[4] burden-shifting framework that is applied in *circumstantial* evidence cases.

See *Stone v. Parish of East Baton Rouge,* 329 Fed. Appx. 542, 545 (5th Cir. 2009).

---

[2]  Section 2000e-2(a) provides as follows:
**(a)  Employer practices**
It shall  be an unlawful practice or an employer --
   (1)  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any
        individual with respect to his compensation, terms, conditions, or privileges of employment,
        because of such individual's race, color, religion, sex, or nationl origin; or
   (2)  to limit, segregate, or classify his employees or ap0plicants for employment in any way which
        would deprive or tend to deprive any individual of employment opportunities or otherwise
        adversely affect his status as an employee, because of such individual's race, color, religion, sex,
        or national origin.
Title 42 U.S.C. §2000-2(a).
[3] Section 2000e-2(m) provides as follows:
**(m) Impermissible consideration of race, color, religion, sex, or national origin in employment**
**practices**
Except as otherwise provided in this subchapter, an unlawful employment practice is established when the
complaining party demonstrates that race color, religion, sex. or national origin was motivating factor for
any employment practice, even though other factors also motivated the practice.

[4]  *McDonnell Douglas Corp. v. Green*, establishes a 3-step burden shifting framework for Title VII cases
based on circumstantial evidence. **First** plaintiff must establish a prima facie case of discrimination by
showing (1) plaintiff belongs to a protected class; 2) plaintiff was qualified for the position; 3) plaintiff

A. EEOC HAS PRODUCED DIRECT EVIDENCE OF RACIAL DISCRIMINATION

Under Title VII, a plaintiff may prove a claim of employment discrimination through either direct or circumstantial evidence. *Fairchild v. All American Check Cashing, Inc.* 815 F.3d 959 (5th Cir. 2016); *Laxton v. Gap Inc*., 333 F.3d 572, 578 (5th Cir.2003); *Wallace v. Methodist Hosp. Sys*., 271 F.3d 212, 219 (5th Cir. 2001); *Portis v. First Nat'l Bank,* 34 F.3d 325, 328 (5th Cir.1994). Direct evidence is evidence which, if believed, proves the fact without inference or presumption. *Jones v. Robinson Prop. Group L.P*., 427 F.3d 987, 992 (5th Cir. 2005). Where a plaintiff can prove disparate treatment by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, he or she does not have to engage in the *McDonnell Douglas* burden-shifting process applicable to circumstantial evidence cases. *Stone v. Parish of East Baton Rouge*, 329 Fed. Appx. 542, 545 (5th Cir. 2009) (citations and quotations omitted).See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

If, however, the plaintiff presents direct evidence of discrimination, "the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor." *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.,* 778 F.3d 473, 475–76 (5th Cir. 2015)*, as revised* (Feb. 3, 2015); *Brown v. E. Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir.1993) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

---

suffered an adverse employment action; and 4) other similarly situated persons were treated more favorably**. Secondly**, the burden then shifts to the Defendant to state a legitimate non-discriminatory reason for the adverse treatment. **Finally,** if Defendant meets its production burden of articulating a non-discriminatory reason for the adverse treatment, the burden shifts back to the plaintiff to show that the defendant's answer is merely a pretext for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).

Plaintiff here has produced evidence of discrimination by deposition testimony of numerous witnesses, declarations and documents that establish that Danny's of Jackson: limited complainants' work hours by imposing a schedule; sent complainants home; forced complainants to work at a less desirable location; imposed fines on complainants for acts that other dancers were allowed to commit; forbade complainants to perform immediately before or after another Black performer, and took other actions that adversely affected the terms and conditions of the complainants' employment.

The Defendant has not shown that the same decisions would have been made regardless of the race of complainants.

In *Etienne v. Spanish Lake Truck & Casino Plaza*, the plaintiff brought a Title VII lawsuit alleging that she was not being promoted to a managerial position because of her race. *Id.,* 778 F.3d at 474. The Fifth Circuit Court of Appeals held that the district court granted the defendant's motion for summary judgment in error, because direct evidence established plaintiff's prima facie discrimination claim. See *id.* at 477. That direct evidence consisted of an affidavit stating that the general manager allocated responsibilities to employees based on the color of their skin and did not allow "dark skin black persons to handle any money" and that he remarked on several occasions that he thought the plaintiff "was too black to do various tasks." *Id.* at 476

In <u>*Jones v. Robinson Property Group*</u>, the plaintiff alleged that he was not hired as a poker dealer because of being an African American. *See* <u>427 F.3d at 990</u>. Evidence was presented by the plaintiff that the poker room manager responsible for the hiring decision stated "the[y] were not going to hire a black person unless there were extenuating circumstances." *Id.* at 993. One of the employees stated that the poker room manager told him that, "maybe I've been

told not to hire too many blacks in the poker room." *Id.* Additional evidence showed that the poker room manager used racially derogatory terms often and stated that "good old White boys don't want Black people touching their cards in their face." *Id.* This evidence constituted direct evidence of discrimination. *Id*

EEOC has also submitted evidence of frequent use by the owners and managers of Danny's Downtown Cabaret of racially derogatory comments. Such offensive language in the workplace can also constitute "direct evidence" of discrimination. The court, in determining whether such comments are direct evidence or merely "stray remarks," looks to four factors: whether the comments are (1) related to the plaintiff's protected characteristic; (2) proximate in time to the challenged employment decision; (3) made by an individual with authority over the challenged employment decision; and (4) related to the challenged employment decision. *See Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 222 (5th Cir.2001). All of the criteria apply in the case *sub judice* with the possible exception of proximity in time to the challenged conduct. However, when the derogatory comments are routine or made over a lengthy period of time, as is the case here, the proximity criteria is met. See *Brown,* 989 F.2d at 861; *Wallace,* 271 F.3d at 222; *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.,* 778 F.3d 473, 476 (5th Cir. 2015), *as revised* (Feb. 3, 2015).

In the case *sub judice,* the evidence of unlawful discrimination presented by EEOC is direct evidence. Direct evidence in the form of sworn deposition testimony and declarations of the complainants, as has been thoroughly discussed, establishes that discriminatory treatment occurred. In most instances, it is also undisputed.

## B. ALTERNATIVELY, THE EEOC HAS ESTABLISHED A PRIMA FACIE CASE OF RACIAL DISCRIMINATION

EEOC contends that even if it is subject to the *McDonnell Douglas* burden shifting framework, it has established a *prima facie* case of discrimination under Title VII under the *McDonnell Douglas* criteria. *McDonnell Douglas* 411 U.S. 792, 802-804 (1973). Consider: (1) It is evident that Complainants belong to a protected class. (2) Complainants are qualified for their positions, which was established when they were hired for the position. (3) Complainants suffered adverse employment actions. As previously discussed, the limiting schedules, the Black quota, being forced to work at Black Diamonds and fined for not doing so, all diminished the Black dancers income ability to earn money. An "adverse employment action" refers to an action that affects the "terms, conditions, or privileges of employment." *Anderson v. Sikorsky Support Servs., Inc.*, 66 F. Supp. 3d 863, 870 (S.D. Tex. 2014)(citing *Young v. City of Houston*, 906 F.2d 177, 182 (5th Cir.1990)). An employment action that affects compensation constitutes an adverse employment action for purposes of Title VII. *Moore v. True Temper Sports, Inc.*, 2011 WL 5507401, at *2 (N.D. Miss. Nov. 10, 2011). (4) Other similarly situated persons were treated more favorably. *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). White dancers were treated more favorably. The White dancers were not limited to certain shifts and were not sent home if too many White dancers were there. White performers set their own schedules and were not made to work at Black Diamonds, nor fined for failing to do so.

Once the plaintiff establishes all elements of the *prima facie* case for discrimination, the burden shifts to the Defendant to state a legitimate non-discriminatory reason for the adverse treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Had the Defendant

done so, the burden would shift back to the Plaintiff to show the Defendant's answer is merely a pretext for discrimination. *Id.*, at 804.

In the instant case, however, the Defendant has not articulated any legitimate non-discriminatory reason for its actions; thus the inference flowing from the Plaintiff's prima facie case "stands unrebutted, and discrimination is established." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1062 (11th Cir. 1994).

## VI. CONCLUSION

No material issue of fact remains to be decided by the trier of fact regarding whether the complainants were subjected to disparate terms and conditions of employment. This court has viewed the evidence in the light most favorable to the non-movant, and for all the reasons stated, concludes that Danny's of Jackson, LLC is liable to each of the complainants for violations under Title VII of the Civil Rights Act of 1964, as amended. The Plaintiff's motion for summary judgment as to liability filed by the United States Equal Employment Opportunity Commission **[doc. no. 81]** is **granted.** This matter will proceed to trial only on the issue of damages and other relief. This trial on damages only is set for January 28, 2019.

SO ORDERED, this, the 30th day of September, 2018.

_____s/ HENRY T. WINGATE _____
UNITED STATES DISTRICT JUDGE